## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Nov 15 2017, 8:46 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Ruth Ann Johnson
Indianapolis, Indiana

Danielle L. Gregory
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Toby J. Gill
Katherine A. Cornelius
Robert J. Henke
Deputy Attorneys General

# IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationship of:

G.C. (Minor Child)

And

R.C. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

November 15, 2017

Court of Appeals Case No.
49A02-1706-JT-1256

Appeal from the Marion Superior Court

The Honorable Marilyn Moores, Judge

The Honorable Scott Stowers, Magistrate

Trial Court Cause No.
49D09-1606-JT-716

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Respondent, R.C. (Mother), appeals the trial court's Order terminating her parental rights to her minor child, G.C. (Child).

We affirm.

## ISSUE

Mother raises one issue on appeal, which we restate as follows: Whether the Indiana Department of Child Services (DCS) presented clear and convincing evidence to support the termination of Mother's parental rights.

## FACTS AND PROCEDURAL HISTORY

Mother is the biological parent of the Child, born on February 4, 2014.[1] Mother has three additional children who are not involved in these proceedings, although Mother no longer has custody of any of her children. In fact, Mother no longer has parental rights to her two oldest sons, primarily due to a long-time struggle with substance abuse.[2] On May 31, 2015, DCS filed a petition alleging the nearly sixteen-month-old Child to be a Child in Need of Services (CHINS). The CHINS petition articulated that Mother had been

---

[1] The Child's biological father is unknown.

[2] With Mother's consent, her oldest son, born July 4, 2007, was adopted in 2009; in 2011, her parental rights to her second son, born August 20, 2008, were terminated; and Mother's youngest son, born September 20, 2016, is the subject of an ongoing case with DCS. The Child is Mother's third son.

arrested on prostitution charges, leaving the Child without a caregiver. Additionally, DCS alleged that Mother lacked stable housing. Furthermore, DCS noted concerns regarding Mother's history of substance abuse and a history of prostitution,[3] as well as DCS's prior involvement with her two oldest children. The Child was placed in foster care.

[5] On June 1, 2015, the trial court held a combined initial and detention hearing, at which Mother failed to appear. The trial court granted wardship of the Child to DCS and determined that Mother was prohibited from exercising parenting time until she appeared in court. Thus, on June 15, 2015, the trial court held a continued initial/detention hearing. Mother appeared, and the trial court ordered that she receive supervised parenting time, with the opportunity for unsupervised parenting time upon the recommendation of DCS and other service providers.

[6] On August 24, 2015, the trial court held a fact-finding hearing; Mother did not appear but was represented by counsel. On Mother's behalf, her attorney entered an admission, and the trial court accordingly adjudicated the Child a CHINS. The same day, the trial court issued a Dispositional Order requiring Mother to participate in services as a condition for reunification with the Child. Specifically, the trial court ordered Mother to engage in a home-based therapy

---

[3] In addition to her May 28, 2015 charge for prostitution, to which Mother pled guilty as a Level 6 felony and was sentenced to 365 days of home detention and 180 days of probation, she was convicted on October 24, 2013, for prostitution in two other cases. It also appears that Mother was convicted of a substance abuse offense in 2011 and gave birth to the Child while serving that sentence.

program and to follow all recommendations; to engage in a home-based case management program and follow all recommendations; to complete a substance abuse assessment and follow all treatment recommendations; and to submit to random drug and alcohol screens.

[7] Thereafter, Mother made minimal effort to participate with the required services. DCS referred her for a substance abuse assessment and treatment on three separate occasions. While she completed an assessment at some point, she never followed through with the recommended treatment. In fact, it was not until the end of December 2016—less than two months prior to a scheduled hearing on the termination of Mother's parental rights—that Mother requested a referral and began seeing a therapist to address her substance abuse and other issues. Even after completing her intake appointment in January of 2017, Mother missed several sessions with the therapist, and the evidence demonstrates that Mother continues to deny having any addiction to controlled substances. In fact, Mother was deceptive to the therapist regarding her drug use. As nearly thirty positive drug screens—collected between August 20, 2015, and February 6, 2017—establish, Mother regularly abuses benzodiazepines (*i.e.*, Xanax), opiates (*i.e.*, codeine, hydromorphone, and morphine), cocaine, marijuana, and others. A toxicologist testified that the levels of morphine and other opiate metabolites in Mother's system indicate that her preferred drug is heroin. Mother never provided DCS with a valid prescription to justify the presence of some of those substances in her system. Mother insisted that she does not "use drugs on a daily basis and I don't see how lack of services and

stuff like that, I'm being punished for it, because they haven't given me the things that I need to even complete this." (Tr. Vol. II, p. 28).

[8] It does appear that Mother, to some extent, engaged in home-based case management. Mother has stable housing, but she is entirely supported by family members as she has not had regular employment since she worked at McDonald's at age fifteen. Mother claimed that, as a result of a childhood car accident, she experiences seizures if she doesn't take medicine, eat right, and get enough sleep. At the encouragement of her family, Mother stated that she applied for social security disability benefits[4] even though she readily conceded that her seizures are under control and do not affect her ability to work. Rather, she explained that she is unemployed because "I don't have to [work]. I have to deal with this 24/7 and fake [c]ourt dates and missed [c]ourt dates and all kinds of stuff." (Tr. Vol. II, p. 35).

[9] Without a job placing any constraints on her schedule, Mother was offered two-hour visits with the Child three times per week. Yet, according to the records maintained by the Child's foster parents, Mother attended about forty of approximately 128 possible visits with the Child between March of 2016 and January of 2017. Mother insisted that she saw the Child "every chance [she] could," and blamed the foster parents and her service provider for the missed visits. (Tr. Vol. II, p. 17). However, the visits occurred while the Child was at

---

[4] It does not appear that any decision on Mother's application had been rendered at the time of the termination hearing.

daycare, and there is no evidence that the foster family interfered with visits. No evidence was presented to indicate how the visits went or whether Mother appropriately parented the Child during those times.

[10] On June 16, 2016, DCS filed a petition to terminate Mother's parental rights to the Child. After the filing, Mother's participation continued to be minimal, especially her visits with the Child. Around December of 2016, the foster parents noticed that the Child's mood would change following a visit with Mother. Normally a very easy-going Child, he was suddenly "grouchy and temperamental," and despite having long been potty-trained, the Child began having accidents following visits. (Tr. Vol. II, p. 112). The foster parents reported their concerns to DCS. As a result, on January 19, 2017, the trial court ordered that Mother's visits be suspended. Following the suspension of Mother's visits, the Child resumed his happy mood and has not had any further issues with potty-training accidents.

[11] On February 7 and March 28, 2017, the trial court conducted a hearing on DCS's termination petition. Along with evidence of Mother's ongoing drug use and refusal to complete the necessary services for reunification, evidence was presented that the Child has thrived in his foster care placement, and his foster parents intend to adopt him. DCS and the Child's guardian *ad litem* (GAL) testified that termination would be in the Child's best interests because he is bonded to the foster parents and is in a safe and stable home. On the other hand, Mother argued that her parental rights should not be terminated because DCS and her service providers had not properly assisted her; she had not

received "a fair shot" with the drug screens because she has "[n]ever in [her] life" used cocaine or heroin; her arrest which initiated DCS's involvement was merely "a tactic" utilized by the FBI because she "know[s] for a hundred percent fact that [she] wasn't" engaging in prostitution; and she never abused or neglected the Child. (Tr. Vol. III, pp. 44, 46, 51). On May 16, 2017, the trial court issued its Order terminating Mother's parental rights to the Child. The trial court specifically concluded that "[t]here is a reasonable probability that the conditions that resulted in the Child's removal and continued placement outside of the home will not be remedied by . . . [M]other"; that [c]ontinuation of the parent-child relationship poses a threat to the [C]hild's well-being"; and that "[t]ermination of the parent[-]child relationship is in the best interests of the [C]hild." (Appellant's App. Vol. II, p. 15).

[12] Mother now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Standard of Review*

[13] Mother appeals the trial court's termination of her parental rights. A parent has an "interest in the care, custody, and control of his or her children [that] is 'perhaps the oldest of the fundamental liberty interests.'" *In re G.Y.*, 904 N.E.2d 1257, 1259 (Ind. 2009) (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). Thus, the Fourteenth Amendment to the United States Constitution protects "the traditional right of parents to establish a home and raise their children." *Id.* Yet, it is also well established that "parental rights are not absolute and

must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights." *S.L. v. Ind. Dep't of Child Servs.*, 997 N.E.2d 1114, 1122 (Ind. Ct. App. 2013) (internal quotation marks omitted) (quoting *In re I.A.*, 934 N.E.2d 1127, 1132 (Ind. 2010)). Termination of parental rights is proper if "parents are unable or unwilling to meet their parental responsibilities." *In re G.Y.*, 904 N.E.2d at 1259-60. We acknowledge that the termination of a parent-child relationship is "an extreme measure and should only be utilized as a last resort when all other reasonable efforts to protect the integrity of the natural relationship between parent and child have failed." *K.E. v. Ind. Dep't of Child Servs.*, 39 N.E.3d 641, 646 (Ind. 2015) (internal quotation marks omitted).

[14] Upon review of a trial court's termination of parental rights, our court does not reweigh evidence or assess the credibility of witnesses. *In re G.Y.*, 904 N.E.2d at 1260. We "consider only the evidence and reasonable inferences that are most favorable to the judgment." *Id.* Additionally, the trial court issued specific findings of fact and conclusions thereon, which requires application of the two-tiered standard of review set forth in Indiana Trial Rule 52(A): "[f]irst, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment." *Id.* We "shall not set aside the findings or judgment unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Ind. Trial Rule 52(A). A trial court has clearly erred "if the findings do not support the trial court's conclusions or the conclusions do not support the judgment."

*In re G.Y.*, 904 N.E.2d at 1260 (quoting *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005)).

## II. *Termination Statute*

To support the termination of a parent's rights, DCS must prove, in relevant part, that a child has been removed from the home for a certain period, and

> (B) that one (1) of the following is true:
>     (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>     (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>     (iii) The child has, on two (2) separate occasions, been adjudicated a [CHINS].
> (C) that termination is in the best interests of the child; and
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS is required to establish each element by clear and convincing evidence. *In re G.Y.*, 904 N.E.2d at 1260.

On appeal, Mother does not challenge the trial court's conclusions that the Child has been removed from her care for the requisite time or that DCS has established a satisfactory plan for the Child's care and treatment going forward. She contends that there is insufficient evidence to support the trial court's conclusions that there is a reasonable probability either that the conditions resulting in the Child's removal and continued placement outside the home will not be remedied or that the continuation of the parent-child relationship poses a

threat to the Child's well-being[5] and that termination is in the Child's best interests. We address each argument in turn.

## A. *Remediation of Conditions*

[17] Mother claims that the evidence does not support the trial court's conclusion that there is a reasonable probability that she will not remedy the conditions resulting in the Child's removal and continued placement outside the home. In determining whether there is a reasonable probability that conditions will not be remedied, we must identify what conditions led to the Child's "placement and retention" outside the home and subsequently determine whether there is a reasonable probability that those conditions will not be remedied. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). In making these decisions, "the trial court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions—balancing a parent's recent improvements against habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation." *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014) (citation omitted) (internal quotation marks omitted) (quoting *Bester*, 839 N.E.2d at 152; *K.T.K.*, 989 N.E.2d at 1231). "Habitual conduct may include

---

[5] Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive; thus, DCS need only prove one of the three elements listed. *See In re A.K.*, 924 N.E.2d 212, 220-21 (Ind. Ct. App. 2010), *trans. dismissed*. In this case, DCS did not allege that the Child has been twice adjudicated a CHINS. Therefore, the relevant inquiry is whether DCS established the existence of a reasonable probability either that the conditions resulting in the Child's removal or continued placement outside the home will not be remedied *or* that the continuation of the parent-child relationship poses a threat to the Child's well-being.

'criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment.'" *K.E.*, 39 N.E.3d at 647. "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change." *Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*. DCS "is not required to provide evidence ruling out all possibilities of change; rather, it need only establish that there is a reasonable probability that the parent's behavior will not change." *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013) (internal quotation marks omitted), *trans. denied*.

[18] In this case, the Child was taken into DCS custody and placed in foster care because Mother was arrested for prostitution, leaving the Child without a suitable caregiver. Furthermore, DCS raised concerns regarding Mother's history of substance abuse and prostitution, as well as her lack of stable housing. According to Mother, the evidence does not establish a reasonable probability that these issues will not be remedied because

> [b]y the time of the termination trial, Mother's criminal matters were resolved with a guilty plea. She'd maintained stable housing for seven (7) to eight (8) months and she was [*sic*] pending a claim for social security benefits. Admittedly, [M]other continued to test positive for substances she was not prescribed up to the day prior to the start of her termination trial; however, she had completed a substance abuse assessment, and she was participating with home based case management and home based therapy at the time of the termination trial.

(Appellant's Br. p. 18) (internal citations omitted). We find no merit in Mother's argument.

[19] The trial court found, in part, that Mother "has had a year and a half to put forth an effort to address issues but has not shown much of an interest in doing so. Stability and sobriety remain major issues. She continues to test positive for marijuana and heroin and even tested positive for marijuana, morphine, and opiates the day before this termination trial began." (Appellant's App. Vol. II, p. 15). Despite Mother's attempt to convince this court to reweigh evidence concerning her partial and last-minute compliance, we find that the trial court's determination is clearly supported by the record.

[20] While Mother pled guilty to the prostitution offense that resulted in the Child's removal, the fact remains that Mother has a history of prostitution and, instead of accepting responsibility and attempting to make changes in her life to avoid returning to the same lifestyle, she denied any wrongdoing and claimed that her third prostitution conviction was a conspiracy orchestrated by the FBI.[6] Similarly, from the time of the Child's removal until the termination hearing, Mother denied having any substance abuse issues even though she had nearly thirty positive drug screens for a variety of illicit substances. Mother refused DCS's repeated attempts to help her overcome her addiction until shortly before

---

[6] It should be noted that Mother was convicted of prostitution because she, in exchange for money, did "knowingly fondle the genitals of another person," who turned out to be a detective with the Indianapolis Metropolitan Police Department; there is no indication of FBI involvement. (GAL's Exh. II).

the termination hearing, and it was well within the trial court's prerogative to disregard those efforts. *See K.T.K.*, 989 N.E.2d at 1234 (noting that the trial court may "disregard the efforts [parent] made only shortly before termination and to weigh more heavily [parent's] history of conduct prior to those efforts"). Mother suggested that some of her positive results were due to prescribed medications for her medical conditions, but she never presented valid prescriptions to support such a claim. Mother further speculated that the results of the drug screens were faulty or that her body had somehow metabolized prescription drugs into cocaine, and she denied ever having used cocaine or heroin. Her dubious claims are made even more suspect by the fact that the CHINS records from her two oldest children are replete with evidence of Mother's long-standing abuse of heroin. We recognize that Mother's drug addiction undoubtedly affects her ability to parent the Child. Addiction

> affects the body. It affects how you think. It affects how you live. It affects your entire life. So, if you have a parent who is in active addiction, the[ir] complete functioning as an individual is affected by their drug of choice, because they are dedicated to only one thing, which is maintaining that level of drug in their body.

(Tr. Vol. II, p. 47).

[21] Despite stable housing as of the termination hearing, Mother relies entirely on her family for support. She sees no need to seek employment, and she filed for social security disability benefits despite a clear admission that her seizures do not interfere with her ability to work. It is up to Mother to be able to support

and care for the Child's needs, and there is nothing in the record to indicate whether the generosity of her family will continue indefinitely. Finally, but significantly, Mother's inconsistent visitation with the Child is simply inexcusable. Instead of prioritizing the Child and considering the ramifications of her actions on his emotions, Mother inexplicably failed to appear for nearly ninety opportunities for visitation between March of 2016 and January of 2017. *See Lang*, 861 N.E.2d at 372 ("[T]he failure to exercise the right to visit one's children demonstrates a 'lack of commitment to complete the actions necessary to preserve [the] parent-child relationship.'" (second alteration in original)). Accordingly, we find that DCS presented clear and convincing evidence to support the trial court's determination that there is a reasonable probability that the conditions resulting in the Child's removal and continued placement outside of Mother's care will not be remedied.[7]

## B. *Best Interests of the Child*

[22] Mother also claims that the evidence does not support the trial court's determination that termination is in the Child's best interests. The purpose of terminating a parent-child relationship is to protect the child, not to punish the parent. *In re C.C.*, 788 N.E.2d 847, 855 (Ind. Ct. App. 2003), *trans. denied*. Thus, while "[c]lear and convincing evidence need not reveal that the continued

---

[7] Having found that there is sufficient evidence of a reasonable probability that conditions will not be remedied, we need not address the alternative element of Indiana Code section 31-35-2-4(b)(2)(B) regarding whether the continuation of the parent-child relationship poses a threat to the Child's well-being. *See In re A.K.*, 924 N.E.2d at 220-21.

custody of the parent . . . is wholly inadequate for the child's very survival[,] . . . it is sufficient to show . . . that the child's emotional and physical development are threatened by the respondent parent's custody." *K.T.K.*, 989 N.E.2d at 1234-35 (quoting *Bester*, 839 N.E.2d at 148). When considering whether termination would be in a child's best interests, the trial court must "look beyond the factors identified by [DCS] and . . . look to the totality of the evidence." *A.D.S.*, 987 N.E.2d at 1158. "The trial court need not wait until the child is irreversibly harmed such that the child's physical, mental and social development is permanently impaired before terminating the parent-child relationship." *K.T.K.*, 989 N.E.2d at 1235. It is well established that "[p]ermanency is a central consideration in determining the [child's] best interests." *Id.* (alterations in original) (quoting *In re G.Y.*, 904 N.E.2d at 1265).

[23] While Mother "concedes the [C]hild needs permanency in a stable environment[,]" she insists that "she has demonstrated a willingness to provide the same." (Appellant's Br. p. 20). She cites her seven-to-eight months of consistent housing and her pursuit of financial assistance through social security benefits as examples of stability. She further notes that when the Child "was removed and placed in foster care, he was a really good baby, he was developmentally on target, and he didn't have any issues." (Appellant's Br. p. 20). Again, we are unpersuaded by Mother's argument.

[24] At the time of the termination hearing, the Child had been removed from Mother's care for nearly two years. During that time, Mother consistently abused drugs, refused DCS's attempts to get her into treatment, and even

violated her probation in the prostitution case. Mother was afforded numerous opportunities to maintain a relationship with the Child, but she instead missed a majority of her visits—to the point that it caused the Child to experience emotional issues. Both DCS and the Child's GAL recommended that termination of Mother's parental rights was necessary for the Child's best interests. DCS and the GAL agreed that the Child needs a safe and stable home and that Mother "has had plenty of time" to make the necessary changes to be a fit parent, which she failed to do. (Tr. Vol. III, p. 40). It is well established that "the recommendation by both the [DCS] case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests." *A.D.S.*, 987 N.E.2d at 1158. Furthermore, the evidence demonstrates that the Child

> has a bond [with the foster parents] and the bond is very appropriate . . . . They are able to meet all his needs. The home is stable and suitable. They're consistent with him. He is in pre-school and soon to start a sport. They're just consistent and he's bonded with them. He loves them and they're his family.

(Tr. Vol. III, p. 38). Accordingly, we find ample evidence to support the trial court's determination that termination is in the Child's best interests.

# CONCLUSION

Based on the foregoing, we conclude that DCS presented clear and convincing evidence to support the termination of Mother's parental rights.

Affirmed.

Robb, J. and Pyle, J. concur